CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 02 2014

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | |
|---|---|
| GREGORY WADE and DEBORAH WADE, Administrators for Estate of ANDREA WADE, deceased, <br><br> Plaintiffs, <br><br> v. <br><br> KELLY ELLIS CARTER[1], et al., <br><br> Defendants. | Civil Action No. 2:13CV00026 <br><br> **MEMORANDUM OPINION** <br><br> Hon. Glen E. Conrad <br> Chief United States District Judge |

Andrea Wade ("Andrea") was booked into the Southwest Virginia Regional Jail in Duffield, Virginia on May 18, 2011. She died seven days later after hanging herself from a bunk bed in her cell. Gregory and Deborah Wade, Andrea's parents and the administrators of her estate, subsequently filed this civil rights action under 42 U.S.C. § 1983, claiming that certain jail officials acted with deliberate indifference to Andrea's serious medical needs. The case is presently before the court on the motion for summary judgment filed by the remaining defendants. For the reasons that follow, the court will grant the motion.

### Factual Background

The following facts are presented in the light most favorable to the plaintiffs. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that all evidence must be construed in the light most favorable to the party opposing summary judgment).

---

[1] Kelly Ellis Carter is incorrectly named in the complaint as "Kelly Ellis." The docket will be amended to reflect her correct name, and the court will refer to her as "Officer Carter" in this opinion.

Andrea was taken into custody at the jail on Thursday, May 18, 2011, after being arrested on multiple counts of obtaining prescription drugs by forgery. She was placed in Pod 7B.

The following day, Nurse Jamie Fleming completed a medical admission data form and a medical screening report. On the data form, Nurse Fleming noted that Andrea suffered from "bipolar/ADHD/panic/anxiety," that she had last received mental health counseling or treatment on May 12, 2011, and that she had been prescribed mental health medications but did not have them with her. Defs.' Ex. 6, Docket No. 25. Nurse Fleming also noted that Andrea was not exhibiting any signs of alcohol or drug withdrawal, that she had never attempted suicide, and that she had not recently considered committing suicide.

According to the medical screening report, Andrea advised Nurse Fleming that she was not under the influence of alcohol or drugs, that she had not used any street drugs in the last three days, that she had never experienced alcohol or drug withdrawal, that she had never thought about hurting or killing herself, and that she was not thinking about doing so at that time. Defs.' Ex. 7, Docket No. 25.

The next morning (Friday, May 20, 2011), Officer Vandella Duncan saw Andrea in the recreation yard and noticed that she appeared to be sick. Officer Duncan inquired as to whether Andrea was possibly going through withdrawal, and Andrea responded in the affirmative. Officer Duncan recommended that Andrea make a sick call request, and she advised the medical department that Andrea was possibly going through withdrawal. Defs.' Ex. 8, Docket No. 25; Duncan Aff. ¶ 2, Docket No. 39-3.

Later that morning, at 9:53 a.m., Andrea filed a grievance using the pod's computer kiosk. She indicated that she was "withdraw[ing] from IV drugs and alc[ohol]," and requested

"something to keep [her] from being sick." Defs.' Ex. 9, Docket No. 25. The following morning (Saturday, May 21, 2011), Andrea was given Pepto-Bismol by a nurse. Id.

On the afternoon of Saturday, May 21, 2011, Andrea submitted another grievance, requesting to see a doctor or nurse. Andrea indicated that she was experiencing diarrhea and vomiting, and that all of the guards had seen her in this state of sickness. Defs.' Ex. 10, Docket No. 25. The second grievance was rejected as an "incomplete request," because Andrea failed to enter her housing location, as required by the computer system. Id.; see also Duncan Aff. ¶¶ 2-3, Docket No. 39-4. She did not attempt to reenter the grievance with the required information. Id.

On the afternoon of Tuesday, May 24, 2011, other inmates, including Jackie Warf, advised Officer Jessica Caldwell that Andrea was "really sick" and "needed help." Warf. Decl. ¶ 4, Docket No. 31-18. The inmates emphasized that Andrea "would just stand there and stare off into space," that she "was constantly throwing up and having diarrhea, that she had not eaten in days[,] and that she was talking out of her head." Id.

Officer Caldwell subsequently called Nurse Elizabeth Jenkins and requested that she come to Andrea's cell. Jenkins wrote the following progress note at 5:10 p.m.:

> Called to housing per Officer Caldwell. Concerned inmate having "spacing out" episodes. Spoke to inmate. Stated she has [history] of bipolar [and] seizure but has not had meds in [approximately] 1 week. Patient oriented to person [and] place. Was confused about date however once told did retain information. Asked inmate if she needed or desired to speak to mental health. Stated she was fine. Stated she thought inmates were talking about her. This nurse assured inmate that no one was talking about her. She requested to Officer Caldwell could she stay in her cell instead of being in population. Officer told her that she had to come down for meals. I explained to inmate that I would place her on MD list to see [the doctor] in AM re: her seizures but would also refer to mental health. Patient was agreeable to this.

Defs.' Ex. 2, Docket No. 25.

3

Neither Officer Duncan nor Officer Carter worked at the jail on Monday, May 23, 2011 or Tuesday, May 24, 2011. They returned to work on Wednesday, May 25, 2011, just before 6:00 a.m., and were assigned to Pod 7, where Andrea was housed. Their duties that morning included serving breakfast trays to inmates housed in Pods 7A, 7B, 7C, 7D, and 7F; gathering inmates for court and medical appointments; and performing twice hourly security checks of the five sections as required by their post orders.[2]

According to the Daily Logs Report, Duncan and Ellis completed a twice hourly check at 6:12 a.m. Defs.' Ex. 5, Docket No. 25. They then served breakfast in the pods. Duncan went to the cell housing Andrea and Lisa Reisenger and asked them if they were going to eat breakfast. Reisenger came out for breakfast, but Andrea indicated that she was not going to eat and stayed in the cell. When Reisenger returned from breakfast, she observed Andrea lying on the bottom bunk bed. Reisenger got in the top bunk bed and went back to sleep.

Just after 7:00 a.m., Officer Duncan escorted some of the inmates from Pod 7 to the jail's laundry to work. Approximately 25 minutes later, Officer Duncan removed the inmates who had to go to court and turned them over to Office Carter. Officer Duncan then spoke to the medical department on the telephone, and removed the inmates who had medical appointments and turned them over to another officer.

Officer Duncan was then notified to send Andrea to the medical department. When Officer Duncan went to the cell to retrieve her, she found Andrea hanging from the top bunk bed

---

[2] The Southwest Virginia Regional Jail Post Orders provide that Officers "shall conduct security rounds of [their] unit at least twice per hour at random intervals," during which they "will inspect all areas and perimeters of [their] area for sanitation, security breaches, or items of repair." Defs.' Ex. 25 at 7, Docket No. 25.

with a bed sheet around her neck. Officer Duncan called for help, awaking Reisenger. Officer Duncan then removed Andrea from the sheet, placed her on the floor, and began CPR.[3]

Andrea was transported by ambulance to Lonesome Pine Hospital in Big Stone Gap, Virginia. Officer Carter accompanied her to the hospital. Andrea was pronounced dead that afternoon.

The plaintiffs have submitted declarations from Deborah Wade and two inmates, Nicole Garrett and Jackie Warf. Wade's declaration indicates that, on Saturday, May 21, 2011, she "went to the jail directly from the pharmacy with prescription drugs for Andrea in the stapled bag the pharmacist had given [her]." Wade Decl. ¶ 3, Docket No. 38. When she told the officer at the front desk that the prescription drugs were for Andrea, "he advised [her] that [the jail] could not accept outside prescriptions." Id. at ¶ 4.

According to Nicole Garrett's declaration, Andrea began experiencing vomiting and diarrhea "after about the first day or two of her incarceration." Garrett Decl. ¶ 2, Docket No. 31-17. Garrett states that she told correctional officers on every shift that Andrea needed to be taken to medical, and that she "never saw [Andrea] get any medical treatment at all, other than to be given Pepto-Bismol on one occasion." Id. at ¶ 3.

Jackie Warf shared a cell with Andrea from May 18, 2011 until May 24, 2011, the day before Andrea died. According to Warf's declaration, Andrea began throwing up and having diarrhea "about the end of the first day of her incarceration." Warf Decl. ¶ 2, Docket No. 31-18. Warf states that Andrea asked to be taken to medical several times, and that inmates told the

---

[3] The parties submitted video footage that was recorded in Pod 7B on the morning of May 25, 2011. The time stamp on the video is off by approximately 24 minutes. The video shows Andrea's cellmate, Lisa Reisenger, entering their cell, which was on the second floor of the pod, at approximately 6:36 a.m. (7:00 a.m. video time). A number of other inmates, dressed in their orange jumpsuits for court, are shown congregating on the lower level. Just after 7:26 a.m. (7:50 a.m. video time), Officer Duncan is shown entering the cell. Immediately thereafter, inmates are shown running up to the second floor, followed by correctional officers.

5

correctional officers that Andrea needed to go to medical. Warf states that "no one ever did anything except [m]edical gave her Pepto-Bismol." Id. at ¶ 8.

## Procedural History

The plaintiffs filed this civil rights action under 42 U.S.C. § 1983 on May 24, 2013. Four days later, the plaintiffs filed an amended complaint, in which they named the following individuals as defendants: Officer Kelly Ellis Carter; Major George Hembree[4], the Jail Administrator; Captain Patricia Caldwell, the Chief of Security; Nurse Elizabeth Jenkins; Officer Vandella Duncan; and Steve Clear, the Superintendent of the Southwest Virginia Regional Jail Authority. The plaintiffs alleged that the defendants acted with deliberate indifference to Andrea's serious medical needs, and that "[a]s a direct and proximate result of [the defendants'] acts and omissions . . . , [Andrea] suffered death by hanging . . . , and the deprivation of her constitutional rights and privileges, including those under the Eighth and Fourteenth Amendments of the United States Constitution." Am. Compl. ¶ 36, Docket No. 6.

The plaintiffs served all of the defendants with the exception of Nurse Jenkins.[5] They subsequently stipulated to the dismissal of their claim against Clear, and the case proceeded against Officer Carter, Major Hembree, Captain Caldwell, and Officer Duncan.

---

[4] Hembree was incorrectly identified in the complaint as "Henry Embrees." The docket will be amended to reflect his correct name.

[5] The plaintiffs were notified of this deficiency on November 7, 2013. Because Nurse Jenkins was not served within 120 days of the filing of the amended complaint, she will be dismissed from the action pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.

6

Following the completion of discovery, the remaining defendants moved for summary judgment. Thereafter, the plaintiffs moved to dismiss their claims against Major Hembree and Captain Caldwell, leaving only the claims against Officer Carter and Officer Duncan.[6]

The court held a hearing on the summary judgment motion on May 12, 2014. The matter is ripe for review.

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-movants. Anderson, 477 U.S. at 255. To withstand a summary judgment motion, the non-movants must produce sufficient evidence from which a reasonable jury could return a verdict in their favor. Id. at 248. "Conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of [the non-movants'] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (quoting Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999)).

## Discussion

The plaintiffs filed suit against Officer Duncan and Officer Carter pursuant to 42 U.S.C. § 1983, which imposes civil liability on any person acting under color of state law to deprive another person of rights and privileges secured by the Constitution and laws of the United States. The

---

[6] The plaintiffs moved to dismiss their claim against Major Hembree in their brief in opposition to the motion for summary judgment. They moved to dismiss their claim against Captain Caldwell during the summary judgment hearing. Both motions will be granted.

plaintiffs claim that the defendants violated Andrea's rights under the Due Process Clause of the Fourteenth Amendment by acting with deliberate indifference to her serious medical needs.[7]

As a general rule, "[o]nly governmental conduct that 'shocks the conscience' is actionable as a violation of the Fourteenth Amendment." Young v. City of Mount Ranier, 238 F.3d 567, 574 (4th Cir. 2001) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)). The degree of culpability on the part of correctional officials that is sufficient to shock the conscience depends on the particular circumstances of the case. Parrish v. Cleveland, 372 F.3d 294, 302 (4th Cir. 2004). "In cases where the government is accused of failing to attend to a detainee's serious medical needs, and in cases where the government is accused of failing to protect a detainee from a substantial risk of physical harm, conduct that amounts to deliberate indifference . . . is viewed as sufficiently shocking to the conscience that it can support a Fourteenth Amendment claim." Id. (internal citation and quotation marks omitted).

"Deliberate indifference is a very high standard -- a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). An official acts with deliberate indifference only when she "knows of and disregards" a substantial risk of harm to a detainee. Farmer v. Brennan, 511 U.S. 825, 837 (1994). In order to be liable under this standard, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [she] must also draw the inference." Id. "Stated somewhat differently, deliberate indifference requires a showing that the defendants <u>actually knew of</u> and <u>disregarded</u> a

---

[7] The plaintiffs also allege that the defendants' conduct violated Andrea's rights under the Eighth Amendment. However, because it appears from the record that Andrea was a pretrial detainee at the time of the events in question, the Eighth Amendment does not apply. Instead, the plaintiffs' claims pertaining to Andrea's care and treatment arise solely under the Due Process Clause of the Fourteenth Amendment. See Riley v. Dorton, 115 F.3d 1159, 1166 (4th Cir. 1997). Nonetheless, a pretrial detainee's rights are "co-extensive" with a convicted prisoner's rights under the Eighth Amendment. Turner v. Knight, 121 F. App'x 9, 13 (4th Cir. 2005) (citing Hill v. Nicodemus, 979 F.2d 987, 990-992 (4th Cir. 1992)).

8

substantial risk of serious injury to the detainee or that they <u>actually knew of</u> and <u>ignored</u> a detainee's serious need for medical care." Parrish, 372 F.3d at 302 (internal citation and quotation marks omitted) (emphasis in original). In Parrish, the United States Court of Appeals for the Fourth Circuit explained that liability under this standard requires two showings:

> First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers should have recognized it; they actually must have perceived the risk. Rich v. Bruce, 129 F.3d 336, 340 n. 2 (4th Cir. 1997). Second, the evidence must show that the official in question subjectively recognized that his actions were "inappropriate in light of that risk." Id. As with the subjective awareness element, it is not enough that the official should have recognized that his actions were inappropriate; the official actually must have recognized that his actions were insufficient. See Brown v. Harris, 240 F.3d 383, 390-91 (4th Cir. 2001).

Id. at 303; see also Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

### I. Deliberate Indifference to Andrea's Risk of Suicide

In this case, the defendants construed the plaintiffs' amended complaint to assert a claim for deliberate indifference relating to Andrea's suicide. Consistent with the defendants' interpretation, the plaintiffs specifically argued, in their brief in opposition to summary judgment, that Officer Duncan and Officer Carter "demonstrated deliberate indifference to a substantial risk that Andrea would commit suicide" at the jail. Pl.'s Br. in Opp'n 10, Docket No. 32; see also id. at 15 (arguing that Andrea should have been "placed in a cell with a camera" and "on a fifteen-minute [suicide] watch"). Nonetheless, during the hearing on the defendants' motion, the plaintiffs advised the court that Andrea's suicide was "not the issue," that they were not seeking to recover for Andrea's death, and that they did not intend to claim that "these [defendants] should have known [Andrea] was going to commit suicide." Realtime Tr. at 36-37, 43; see also id. at 24 ("I appreciate the defendant[s'] arguments. However, we didn't file an action . . . because Andrea committed suicide."). The plaintiffs explained that they were instead seeking to recover for any

9

pain and suffering that Andrea endured prior to her death on the basis that the defendants acted with deliberate indifference to her withdrawal symptoms. See id. at 37 ("What we said is [Andrea] was denied her constitutional right to the necessary medical care for her serious medical needs . . . [Officer Duncan] knew that . . . drug and alcohol withdrawal is a serious medical issue.")

To meet the high standard of deliberate indifference in a prison suicide case, "the evidence must [first] show that the defendant[s] actually knew of the detainee's suicidal intent, not merely that [they] should have recognized it." Hearn v. Lancaster County, No. 13-1588, 2014 U.S. App. LEXIS 6974, at *8 (4th Cir. Apr. 15, 2014). On the present record, no reasonable juror could find that Officer Duncan or Officer Ellis possessed such knowledge. Since the plaintiffs seemingly concede that they are unable to establish this element, and appear to have withdrawn any claim relating to Andrea's suicide, the court will grant the defendants' motion for summary judgment with respect to this portion of the plaintiffs' amended complaint.

## II. Deliberate Indifference to Andrea's Withdrawal Symptoms

Turning to the plaintiffs' claim that Andrea was denied adequate medical treatment, the court assumes, for purposes of the defendants' motion, that the withdrawal symptoms Andrea experienced constituted a serious medical need. See Pl.'s Ex. F, Docket No. 31-6 ("Alcohol Withdrawal . . . [i]s the abstinence syndrome with the highest mortality rate, although withdrawal from opiates and depressant drugs (e.g. benzodiazepines) may on occasion be life-threatening."); see also Navolio v. Lawrence Cnty., 406 F. App'x 619, 622 (3d Cir. 2011) (assuming that the chemical withdrawal a pretrial detainee experienced was a serious medical need) (citing cases). The remaining question, therefore, is whether the plaintiffs produced sufficient evidence from which a reasonable jury could find that the defendants acted with deliberate indifference to Andrea's serious medical need. For the following reasons, the court concludes that they did not.

The record indicates that Andrea began to suffer from vomiting and diarrhea "about the end of the first day of her incarceration." Warf Decl. ¶ 2, Docket No. 31-18. On the morning of Friday, May 20, 2011, two days after Andrea was taken into custody, Officer Duncan noticed that Andrea appeared to be sick and suspected that she might be suffering from withdrawal symptoms. Rather than doing "nothing," as the plaintiffs suggest in their brief in opposition, the uncontroverted evidence establishes that Officer Duncan recommended that Andrea make a sick call request and advised medical that Andrea was possibly going through withdrawal. See Defs.' Ex. 8, Docket No. 25; Duncan Aff. ¶ 2, Docket No. 39-3. Upon returning to the pod, Andrea submitted a grievance indicating that she was "withdraw[ing] from IV drugs and alc[ohol]," and that she needed "something to keep [her] from being sick." Defs.' Ex. 9, Docket No. 25. The medical department responded to the grievance and gave Andrea Pepto-Bismol the following morning. See id.

Three days later, on the afternoon of Tuesday, May 24, 2011, Andrea was seen by Nurse Jenkins, who placed her on the list to be examined by a doctor. While the plaintiffs contend that Andrea should have seen a doctor sooner, neither Officer Duncan nor Officer Carter worked at the jail on Monday, May 23, 2011 or Tuesday, May 24, 2011, when Andrea's symptoms apparently worsened and she began to "talk[] out of her head." Warf. Aff. ¶ 4, Docket No. 31-18. Even assuming that these defendants were aware that Andrea was still suffering from vomiting and diarrhea on Sunday, May 22, 2011, when they were on duty, there is simply no evidence from which a reasonable jury could find that they acted with deliberate indifference to Andrea's medical needs. Instead, the plaintiffs' own evidence indicates that nurses continued to treat Andrea's intestinal problems with an over-the-counter medication. See id. at ¶ 8 ("Andrea and a lot of us in the pod had told Caldwell and all the other officers in the pod many times how sick Andrea was

and that she needed to go to Medical but no one ever did anything except Medical gave her Pepto-Bismol."); see also Pl.'s Br. in Opp'n at 4-5 ("[N]o action whatsoever was ever taken either with regard to Andrea's mental or physical condition other than to notify the nurse, whose only action was to give Andrea Pepto-Bismol.").

While the plaintiffs question the propriety of this course of treatment, the deliberate indifference standard "is not satisfied by . . . mere disagreement concerning '[q]uestions of medical judgment,'" Germain v. Shearin, 531 F. App'x 392, 395 (4th Cir. 2013) (quoting Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975)), or mere negligence in diagnosis or treatment. See Webb v. Hamidullah, 281 F. App'x 159, 166 (4th Cir. 2008) ("Put simply, negligent medical diagnoses or treatment, without more, do not constitute deliberate indifference."). Moreover, as non-medical staff members, Officer Duncan and Officer Carter "cannot be liable for the medical staff's diagnostic decisions." Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002). Instead, they were entitled to rely on the medical judgment and expertise of the medical professionals charged with providing care to Andrea and the other inmates. See Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) (citing Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990)); see also Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants . . . can rely on the expertise of medical personnel. We have previously stated that if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.").

In their response to the defendants' summary judgment motion, the plaintiffs rely heavily on certain jail policies, including its Standard Operating Procedure ("SOP") for the Management of Intoxication, Alcohol & Drug Withdrawal ("SOP MG-02"). The plaintiffs emphasize that this policy recognizes that withdrawal from alcohol or drugs can be potentially life-threatening, and

that a physician should be consulted "[w]henever severe withdrawal symptoms are observed." SOP MG-02 at 2, Docket No. 31-6. As the defendants emphasize in reply, however, this policy clearly places responsibility on the medical staff, rather than the correctional officers, to assess and manage symptoms of withdrawal.[8] See id. ("Health Care staff will have several roles in the management of intoxication and withdrawal: (a) appropriate assessment of intoxication and withdrawal; (b) treatment of disorders associated with [Alcohol and Other Drugs]; (c) appropriate prescription of psychotropic drugs; and (d) supportive and appropriate counseling of patients during clinical encounters."). Even if the plaintiffs could show that the policy was violated, the failure to follow internal protocols or procedures, while perhaps probative of negligence, is not sufficient to establish deliberate indifference. See Belcher v. Oliver, 898 F.2d 32, 36 (4th Cir. 1990) (holding that the defendants' "failure to follow procedures established for the general protection and welfare of inmates [did] not constitute deliberate disregard for the medical needs of a particular intoxicated individual").

Finally, to the extent the plaintiffs take issue with the fact that "Duffield refused to accept [the] prescription medication" that Deborah Wade attempted to deliver for Andrea, Pl.'s Br. in Opp'n at 2, Docket No. 32, there is simply no basis for holding these defendants liable for this alleged deficiency. Neither Officer Duncan nor Officer Carter spoke to Wade when she visited the jail on Saturday, May 21, 2011, and there is no evidence that either of these defendants was aware of Andrea's prescription medication history, or prevented Andrea from receiving her prescribed medications. See Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977) (explaining that liability under § 1983 "will only lie where it is affirmatively shown that the official charged

---

[8] This is consistent with SOP MA-02, another policy submitted by the plaintiffs, which provides that the delivery of healthcare within the jail will be a joint effort between custody staff and health staff, but that "[q]ualified health care professionals will carry out the decisions and actions regarding health care provided to inmates to meet their serious medical needs." Pl.'s Ex. H, Docket No. 31-8.

13

acted personally in the deprivation of the [detainee's] rights") (internal citation and quotation marks omitted).

## Conclusion

In sum, the court concludes that no reasonable jury could find that Officer Duncan or Officer Carter actually knew of and disregarded a substantial risk of serious injury to Andrea, or actually knew of and ignored her serious medical needs. See Parrish, 372 F.3d at 302 While the court sympathizes with the plaintiffs' loss, the evidence is simply insufficient to permit their claims of deliberate indifference to proceed to trial against these remaining defendants. Accordingly, the court will grant the defendants' motion for summary judgment.[9]

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 2d day of July, 2014.

_____
Chief United States District Judge

---

[9] Having concluded that no reasonable jury could find that the defendants acted with deliberate indifference to Andrea's serious medical condition, the court need not address the defendants' argument that they are entitled to qualified immunity. See, e.g., Knight v. Wiseman, 590 F.3d 458, 462 (7th Cir. 2009) (noting that courts need not reach the issue of qualified immunity when "the merits of the deliberate indifference claim are dispositive of the case").